IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


| | | |
|---|---|---|
| THOMAS J. THOMPSON, INDIVIDUALLY AND AS THE GUARDIAN OF K'HIRY GALLAGHER-THOMPSON, | ) ) ) ) ) | CIV. NO. 11-00791 BMK

ORDER GRANTING DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS COMPLAINT |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, ET AL., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |


## ORDER GRANTING DEFENDANT
## UNITED STATES OF AMERICA'S MOTION TO DISMISS COMPLAINT

Before the Court is Defendant United States of America's (the "Government") Motion to Dismiss Complaint (the "Motion"). (Doc. no. 80.) The Motion came on for hearing before the Court on February 17, 2015.[1] After careful consideration of the Motion, the supporting and opposing memoranda, and the arguments of counsel, the Court GRANTS the Motion in its entirety.

---

[1] Defendant William L. Lum's Motion for Summary Judgment was heard by this Court concurrently with the present Motion. (Doc. no. 81.) However, the Court continued the hearing on that motion, which is the subject of a separate order. (Doc. no. 93.)

# BACKGROUND

## I.    FACTUAL BACKGROUND

This case arises out of Plaintiff Thomas J. Thompson's ("Plaintiff")
allegation that Defendant William L. Lum ("Mr. Lum"), a recruiter for the Hawaii
Army National Guard ("HIARNG"), sexually assaulted Plaintiff's 17-year-old
daughter, K'Hiry Gallagher-Thompson ("K'Hiry"), in 2009 while he was trying to
recruit her for the HIARNG.  Plaintiff, as K'Hiry's adoptive father and court-
appointed guardian, filed suit against Mr. Lum and the Government under the
Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*.

The preliminary facts are largely undisputed.[2]  Mr. Lum joined the
HIARNG in 2000 and served in Iraq and Kuwait.  (Decl. of William L. Lum[3]
("Lum Decl.") at 2-3.)  According to the Government, in late 2007, Mr. Lum was
ordered to active duty for special work with the HIARNG Recruiting and

_____

[2] For the purpose of background information, the Court also references the facts presented in Mr. Lum's Motion for Summary Judgment and the memoranda in support of and opposition to that motion.

[3] Mr. Lum's Declaration, relied upon in his Motion for Summary Judgment, was previously filed with his Motion to Compel the United States to Represent Defendant William L. Lum, Substitute the United States as Defendant for William L. Lum, and Dismiss William L. Lum from Lawsuit Pursuant to 28 USC § 2679 ("Motion to Compel Representation") on January 27, 2014.  (Doc. no. 58-1.)  The declaration is also attached as Exhibit 3 to Plaintiff's memorandum in opposition. (Doc. no. 86-4.)

Retention Battalion.  (Mot., Decl. of Ricardo D. Santos ("Santos Decl.") ¶ 4.)  Mr.

Lum underwent a two-part training program involving a correspondence portion

and a resident portion.  During the resident portion, Mr. Lum received 240 hours of

training at the Army National Guard Recruiting and Retention NCO Course in

Arkansas between January and February 2008.  (Id. ¶ 6.)  Mr. Lum also received

various other training, including the Prevention of Sexual Harassment Training and

Accident Avoidance Course.  (Id. ¶ 8.)

         The Government states that there was no serious misconduct noted in

Mr. Lum's employment file.  (Mot., Decl. of Loren Penney ("Penney Decl.") ¶ 7.)

It claims that Mr. Lum received annual feedback reviews and was counseled

monthly by his supervisor as to the proper and effective performance of his job

duties.  (Mot., Santos Decl. ¶ 9.)

         In or around July 2009, Mr. Lum received a lead on a possible recruit

from a fellow recruiter, Sergeant First Class David Pimentel.  (Compl. ¶¶ 14-15;

Lum Decl. at 3-4; Mem. in Opp'n to Mot. for Summ. J., Exh. 1.)  Sergeant

Pimentel stated that he had arranged to meet K'Hiry at her high school, but K'Hiry

had failed to show up.  K'Hiry subsequently called and texted Sergeant Pimentel,

but Sergeant Pimentel described the communication as "totally inappropriate; she

was very flirtatious."  (Mem. in Opp'n to Mot. for Summ. J., Exh. 1.)  Sergeant

Pimentel was unable to meet with K'Hiry, so he referred the case to Mr. Lum, who was located closer to K'Hiry. (Id.)

In late July 2009, K'Hiry met Mr. Lum at Kahala Mall to take the computerized Enlistment Screening Test for admission into the HIARNG. (Compl. ¶ 15; Lum Decl. at 4.) Mr. Lum left K'Hiry alone while she took the test; however, when he returned, she had failed to complete the test and was talking on her cellular phone. (Compl. ¶ 16; Lum Decl. at 4.) Mr. Lum claims that K'Hiry told him that she was not interested in joining the HIARNG and that she "was more interested in me." (Lum Decl. at 4.) After the meeting at Kahala Mall, Mr. Lum and K'Hiry continued to communicate through text messages and phone calls. Mr. Lum claims that he was trying to recruit K'Hiry and wanted to establish connections with the mixed martial arts ("MMA") community through Plaintiff, who is a well-known MMA fighter. (Id. at 4-5.) Conversely, Plaintiff alleges that Mr. Lum's "offer of assistance was a pretext to initiate and exploit a personal and/or sexual relationship with K'Hiry . . . ." (Compl. ¶ 18.)

It is undisputed that, in early August 2009, K'Hiry twice went to Mr. Lum's residence in the Kahala area. (Compl. ¶ 19; Lum. Decl. at 5.) However, this is the point where the parties' versions of events drastically diverge. Mr. Lum claims that K'Hiry suddenly contacted him in the evening of the first subject

incident and said that she wanted to stop by his residence. (Lum Decl. at 5.) At the time, Mr. Lum was home playing video games with his roommate, Christopher Lloyd Riley. (Id.; Statement of Christopher Lloyd Riley[4] ("Riley Stmt.") at 1-2.) When K'Hiry arrived, she looked disheveled and wet, so Mr. Lum offered to let K'Hiry use the bathroom to freshen up. (Lum Decl. at 5; Riley Stmt. at 2.) Mr. Lum and his roommate thereafter invited her to play video games with them. (Lum Decl. at 5; Riley Stmt. at 2.) K'Hiry declined and instead looked at her MySpace webpage on Mr. Lum's computer, danced and sang, and made sexual innuendos. (Lum Decl. at 5; Riley Stmt. at 2-3.) K'Hiry left shortly thereafter, and Mr. Lum states that he did not have any inappropriate contact with her. (Lum Decl. at 5.)

Conversely, Plaintiff alleges that

Defendant Lum's roommate left the living room after K'Hiry came over and Defendant Lum then had sexual intercourse with K'Hiry on the couch in the living room. He stopped having sexual intercourse with K'Hiry after he noticed that she was having her period and asked her to "finish him off" with "head" (fellatio), which she performed. K'Hiry then showered at Defendant Lum's residence and left crying. K'Hiry then called her therapist, Ms. Susan Denham, crying from a bus stop about her sexual encounter with Defendant Lum.

---

[4] Mr. Riley's statement is attached to Mr. Lum's Declaration.

(Mem. in Opp'n to Mot. for Summ. J., Exh. 2 at 5.)

Approximately a week after the first subject incident, K'Hiry again texted Mr. Lum and asked if she could come to his residence. (Lum Decl. at 6; Riley Stmt. at 3.) Again, Mr. Lum and his roommate were present, and she allegedly hugged Mr. Lum as she arrived. (Lum Decl. at 6; Riley Stmt. at 3.) She sat on the couch, but shortly thereafter noticed that she was having her period and had bled onto the couch cover. (Lum Decl. at 6; Riley Stmt. at 3.) Mr. Lum's roommate became embarrassed and left the room to go upstairs. (Lum Decl. at 6; Riley Stmt. at 3-4.) K'Hiry allegedly followed shortly after the roommate and used the upstairs shower. (Lum Decl. at 6; Riley Stmt. at 4.) Mr. Lum claims that K'Hiry returned downstairs and again made sexual comments. (Lum Decl. at 6.) Mr. Lum states that he did not touch K'Hiry in an inappropriate manner, and she left shortly thereafter. (Id. at 6.) Mr. Lum claims that, a week or two after K'Hiry's second visit, Plaintiff and two other men appeared at Mr. Lum's residence. Plaintiff accused Mr. Lum of sexually abusing K'Hiry, and the three men assaulted Mr. Lum. (Id. at 6-7.)

Plaintiff says that he does not have much information regarding the second alleged incident, but only knows that it occurred at Mr. Lum's residence. K'Hiry's psychologist has counseled against asking K'Hiry about the incidents,

because of the traumatic effects it will have on her.  (Mem. in Opp'n to Mot. for Summ. J., Exh. 2 at 6.)

II.    PROCEDURAL BACKGROUND

On December 28, 2011, Plaintiff filed his Complaint for Damages against the Government and Mr. Lum.  (Doc. no. 1.)  In the Complaint, Plaintiff alleges five causes of actions: (1) Negligent failure to control/supervise against the Government; (2) Negligent infliction of emotional distress against the Government and Mr. Lum; (3) Negligent training against the Government; (4) Battery against Mr. Lum; and (5) Intentional Infliction of Emotional Distress against Mr. Lum. (Id.)

On January 27, 2014, Mr. Lum filed his Motion to Compel Representation, arguing that any alleged wrongdoing occurred while he was acting within the scope of his employment with the Government.  (Doc. no. 58.)  He requested that the Court order that the Government be substituted as the defendant in his place and dismiss him from the lawsuit.  (Id.)  However, the Court denied that motion, holding that "Lum's meetings with K'Hiry were not related to his employment as a recruiter."  (Order Denying Without Prejudice Motion to Compel Representation at 5 (doc. no. 69).)  The Court further determined that Mr. Lum's "conduct was not the type he was employed to perform as a recruiter for the

National Guard[;] . . . the two meetings were not within authorized time and space limits for his employment[; and] . . . the evidence does not establish that his conduct was actuated by a purpose to serve the National Guard because no discussions regarding recruitment occurred at his home."  (Id. at 7.)

## STANDARD

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the court's subject matter jurisdiction over the claims asserted.  Fed. R. Civ. P. 12(b)(1).  "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation. . . ." Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006) (citation omitted).  A Rule 12(b)(1) challenge may be made on the face of the complaint or by relying on affidavits or any other evidence properly before the court.  Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003); St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989).  The plaintiff must then "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." St. Clair, 880 F.2d at 201.

When the Government moves to dismiss for lack of subject matter jurisdiction on the basis of the discretionary function exception, the court may

consider the challenged pleadings, as well as jurisdictional facts supplied by affidavit, declaration, or other evidence properly before the court. <u>Green v. United States</u>, 630 F.3d 1245, 1248 n.3 (9th Cir. 2011). The party asserting subject matter jurisdiction usually bears the burden of establishing proper jurisdiction. <u>See Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.</u>, 594 F.2d 730, 733 (9th Cir. 1979). However, when the discretionary function exception is invoked, the Government bears the burden of establishing that the exception applies. <u>See Whisnant v. United States</u>, 400 F.3d 1177, 1181 (9th Cir. 2005); <u>Bear Medicine v. United States ex rel. Sec'y of the Dep't of the Interior</u>, 241 F.3d 1208, 1213 (9th Cir. 2001).

<u>DISCUSSION</u>

I.      <u>THE GOVERNMENT'S MOTION TO DISMISS</u>

In essence, the Government argues that the discretionary function exception to the FTCA warrants dismissal in its favor, because the Court lacks subject matter jurisdiction over Plaintiff's claims. It argues that Plaintiff's First (Negligent Failure to Control/Supervise) and Third (Negligent Training) Causes of Action are barred by the discretionary function exception, because Plaintiff does not allege that the Government violated any specific policy or regulation. Furthermore, the Second Cause of Action (Negligent Infliction of Emotional

Distress) must also be dismissed, because Mr. Lum was not acting within the scope of his employment at the time that the alleged incidents occurred.

A.    Discretionary Function Exception

"Sovereign immunity is an important limitation on the subject matter jurisdiction of federal courts." Vacek v. U.S. Postal Serv., 447 F.3d 1248, 1250 (9th Cir. 2006). Normally, "[a] party may bring an action against the United States only to the extent the government waives its sovereign immunity." Valdez v. United States, 56 F.3d 1177, 1179 (9th Cir. 1995). The FTCA waives the Government's sovereign immunity for claims "arising out of the negligent conduct of government employees acting within the scope of their employment." Soldano v. United States, 453 F.3d 1140, 1145 (9th Cir. 2006) (citing Valdez, 56 F.3d at 1179). However, the discretionary function exception "restores the government's immunity in situations where its employees are carrying out governmental or 'regulatory' duties." Faber v. United States, 56 F.3d 1122, 1124 (9th Cir. 1995). Thus, the Government is not liable for:

> ***Any claim*** based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or ***based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty*** on the part of a federal agency or an employee of the Government, whether or

not the discretion involved be abused.

28 U.S.C. § 2680(a) (2006) (emphasis added). In other words, the Government and its employees cannot be sued under the FTCA for claims based upon a discretionary function of the government. The discretionary function exception is said to "mark[ ] the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." Berkovitz v. United States, 486 U.S. 531, 536 (1988). "Where the exception applies, no federal subject matter jurisdiction exists." In re Glacier Bay, 71 F.3d 1447, 1450 (9th Cir. 1995) (citing Lesoeur v. United States, 21 F.3d 965, 967 (9th Cir. 1994)).

Courts apply a two-part test to analyze whether the discretionary function exception bars a particular claim. Alfrey v. United States, 276 F.3d 557, 561 (9th Cir. 2002). First, the court must decide "whether the challenged conduct is discretionary, that is, whether it 'involv[es] an element of judgment or choice.'" Id. (quoting Fang v. United States, 140 F.3d 1238, 1241 (9th Cir. 1998)). "This element is not met 'when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow . . . .'" Id. (quoting Fang, 140 F.3d at 1241).

Second, if the challenged conduct is discretionary, the court "must

determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Id. (quoting Berkovitz, 486 U.S. at 536). The purpose of the discretionary function exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Berkovitz, 486 U.S. at 536-57 (internal quotation marks and citation omitted). Thus, the discretionary function exception protects "only governmental actions and decisions based on considerations of public policy." Id. at 537. "It is not necessary for the government to prove a conscious decision based on a policy analysis." Weissich v. United States, 4 F.3d 810, 813 (9th Cir. 1993). "It is enough that the choice is one to which a policy analysis may apply." Id.

If the discretionary function exception applies to a particular claim, the court lacks subject matter jurisdiction over that claim and the claim must be dismissed. Bibeau v. Pac. Nw. Research Found., Inc., 339 F.3d 942, 945 (9th Cir. 2003); see also Mundy v. United States, 983 F.2d 950, 952 (9th Cir. 1993). While the burden of proving the applicability of the discretionary function exception falls on the Government, the "plaintiff must advance a claim that is facially outside the discretionary function exception in order to survive a motion to dismiss." Doe v. Holy See, 557 F.3d 1066, 1084 (9th Cir. 2009) (quoting Prescott v. United States,

973 F.2d 696, 702 & n.4 (9th Cir. 1992)) (quotation marks omitted).

B.    First and Third Causes of Action

The Government first seeks dismissal of Plaintiff's First (Negligent Supervision/Control) and Third (Negligent Training) Causes of Action based on the discretionary function exception. The Government argues that, under the Ninth Circuit's holdings in Doe v. Holy See, 557 F.3d 1066 (9th Cir. 2009), and Vickers v. United States, 228 F.3d 944 (9th Cir. 2000), the discretionary function exception requires dismissal of the First and Third Causes of Action. Relying primarily on Holy See, in which the Ninth Circuit held that policy of not firing priests for their abusive acts was covered by a similar discretionary function exception, the Government contends that the regulations cited by Plaintiff in his Complaint do not

> impose mandatory training and supervision duties on the HIARNG. Similar to Holy See, Plaintiff vaguely references a policy but has failed to set forth a specific policy or regulation that the United States has violated. Further, Plaintiff has failed to set forth any evidence that the United States had no discretion in implementing the manner in which Defendant LUM was supervised.

(Mot. at 8-9.) The Government further argues that Mr. Lum received proper supervision, as evidenced by his monthly counseling sessions and annual review, as well as the HIARNG's investigation into Plaintiff's allegations. (Id. at 9.)

As to the Third Cause of Action for Negligent Training, the

13

Government argues that the Ninth Circuit has recognized that the training of

employees is another "discretionary" act under <u>Holy See</u> and <u>Vickers</u>. (<u>Id.</u> at 10.)

The Government additionally references <u>Burkhart v. Washington Metropolitan</u>

<u>Area Transit Authority</u>, 112 F.3d 1207 (D.C. Cir. 1997), for the proposition that

> [t]he extent of training with which to provide employees
> requires consideration of fiscal constraints, public safety,
> the complexity of the task involved, the degree of harm a
> wayward employee might cause, and the extent to which
> employees have deviated from accepted norms in the
> past. Such decisions are surely among those involving
> the exercise of political, social, or economic judgment.

112 F.3d at 1217. The Government argues that the regulations cited by Plaintiff

"do not impose any specific and mandatory duties as to the training provided by

HIARNG to Defendant Lum." (Mot. at 11.) Rather, the Government claims that

"the factors which drove the scope of training given to military recruiters were

based on policy considerations, including but not limited to the resources afforded

to the military unit. (<u>Id.</u> (citing Santos Decl. ¶ 8).) The Government further argues

that Mr. Lum was provided with extensive training, including 240 hours at the

Army National Guard Recruiting and Retention NCO Course and the Prevention of

Sexual Harassment training provided by the State of Hawaii. (<u>Id.</u> (citing Santos

Decl. ¶¶ 6, 8).)

In opposition, Plaintiff argues that he properly alleged claims of

(1) general negligence, (2) negligent infliction of emotional distress, and

(3) negligent failure to train, supervise, and discipline Mr. Lum.[5]  (Mem. in Opp'n

at 5.)  In support of his argument, Plaintiff recites paragraphs 6 through 39 of his

Complaint.  (Id. at 5-9.)  He also points to Mr. Lum's Declaration, in which Mr.

Lum states that he was attempting to recruit K'Hiry and make contacts with

Plaintiff, a well-known MMA fighter.  (Id. at 10.)  Plaintiff claims that Mr. Lum's

explanation of his actions "comport with the policies and regulations, identified

through discovery in this matter, that imposes mandatory duties upon the command

structure of the Hawaii Army National Guard that were clearly not adhered to in

the recruiting of leads such as K'Hiry."  (Id. at 11.)

     Additionally, Plaintiff highlights the various policies and regulations

---

[5] With regard to the First Cause of Action, the Complaint identifies
various rules, regulations, or policies allegedly requiring the Government to
exercise sufficient control over Mr. Lum, including National Guard Regulation
600-21, Army Regulation 600-20, and Department of Defense Directive 6495.1,
which prohibit Mr. Lum from engaging in sexual harassment, sexual assault, or a
personal relationship with potential recruits.  (Compl. ¶ 28.)  Plaintiff also cites to
National Guard Regulation 385-10, which requires the National Guard and Mr.
Lum's supervisors to identify, report, evaluate, minimize, and/or eliminate
operating hazards, errors and accidents.  (Id. ¶ 29.)  As to the Third Cause of
Action, Plaintiff alleges that the Government failed to properly train Mr. Lum, in
violation of National Guard Regulation 600-21, Army Regulation 600-20, and
Department of Defense Directive 6495.1.  (Id. ¶ 37.)  Although Plaintiff cites to
these various regulations in his Complaint, he does not raise them in connection
with the present Motion.

that he claims the Government violated. First, the United States Army Recruiting Command's "Recruiting Operations" manual (the "Recruiting Operations manual") states at section 4-10 that, "[o]f course, a commander cannot direct recruiters to simply 'go out and prospect!' Like any other tactical mission, prospecting must be planned and purposeful if it is to be effective." (Mem. in Opp'n at 11 (quoting Exh. 4 at 4-3, § 4-10) (emphasis omitted).) Section 4-13 advises commanders of their planning duties, stating that "[t]he urgent nature of recruiting requires commanders to carefully study and map the market so they can direct their forces to the most target-rich areas. Commanders at all levels have tools that help determine where, when, and how to prospect most effectively. At station level commanders must consider their strengths, weaknesses, opportunities, and threats (SWOT), recruiting functions analysis, and prospecting analysis to prepare their recruiting operation plan (ROP)." (Id. at 11-12 (quoting Exh. 4 at 4-4, § 4-13).) The ROP is a "continuous process" that "begins with a detailed analysis of the recruiting environment and culminates in a synchronized operational plan to accomplish the mission. Subordinate plans, even though market driven, must be nested in the next higher echelon's plans. Once implemented, the ROP must be continuously monitored and adjusted if necessary to redirect operations or exploit timely opportunities." (Id. at 12 (quoting Exh. 4 at 4-8, § 4-40) (emphasis

omitted).)

Plaintiff also relies on the publication titled "Personnel Procurement: Army National Guard Strength Maintenance Program," NGR-601, April 28, 2006, issued for use throughout the Army National Guard (the "Personnel Procurement regulation"). (Mem. in Opp'n, Exh. 6.)[6] Plaintiff claims that the policies and practices contained therein "impose certain duties on the command structure of the Hawaii Army National Guard." (Mem. in Opp'n at 13.) In particular, Plaintiff claims that the duties of commanders include "[d]evlop[ing] organizational plans and strength studies that integrate demographic analysis for military command

---

[6] Plaintiff's Exhibit 5 to his memorandum in opposition originally spliced together sections from the April 28, 2006 "Personnel Procurement: Army National Guard Strength Maintenance Program," NGR 601-1, with the August 4, 2006 pamphlet entitled "Personnel Procurement: Army National Guard Strength Maintenance Program," NG Pam. 601-1. Subsequent to the hearing on the present Motion, Plaintiff filed his Amended Exhibits "5" and "6" to Plaintiff's Memorandum in Opposition to Defendant United States of America's Motion to Dismiss Complaint. (Doc. no. 91.) Therein, he attached Exhibits 5 and 6 with little explanation. The Court then ordered Plaintiff to clarify whether the Amended Exhibits merely corrected the previously misfiled exhibits, or contained further policies and procedures not already before to the Court. (Doc. no. 92.) Plaintiff clarified that the amended Exhibit 5 is simply a correction of the previously filed Exhibit 5 that removed the portions of Exhibit 6 erroneously included therein. (Doc. no. 94.) However, Plaintiff stated that Exhibit 6 included five new pages, which purported to evidence "general information about the command structure, roles, duties, and responsibilities that exist within the" HIARNG. (Id. at 3.) For the purposes of this Order, the Court references Exhibits 5 and 6 as they are attached to Plaintiff's Amended Exhibits "5" and "6." (Doc. no. 91.)

structure location/relocation, organization and reorganizations to determine the impact command structure changes will have on the future structure and composition of the [Army National Guard] on SM ["strength maintenance"], and to ensure that RRNCOs ["Recruiting and Retention Non-Commissioned Officers"] are focusing on the most lucrative markets." (Id. at 14 (quoting Exh. 6 at 7, § 2-11) (emphasis omitted) (explanatory brackets added).) The Recruiting and Retention Sergeant Majors are responsible for "assist[ing] . . . in developing the State SM Plan and implementing and monitoring the State SM Program." (Id. (quoting Exh. 6 at 8, § 2-16).) The Recruiting and Retention Non-Commissioned Officers in Charge are tasked with "[e]stablish[ing] performance standards, monitor[ing] and evaluat[ing] RRNCOs on the overall effectiveness of their recruiting and retention activities/programs." (Id. at 14-15 (quoting Exh. 6 at 9, § 2-17).)

With regard to the publication titled "Personnel Procurement: Army National Guard Strength Maintenance Program," NG Pam. 601-1, August 4, 2006 ("Personnel Procurement pamphlet"), Plaintiff points to the policy of "prospecting," which is a "systematic, continuously planned approach to generating leads." (Id. at 12 (citing Exh. 5 at 37, § 5-2).) Plaintiff argues that the Government recognizes that focusing on "Center[s] of Interest (COI) or Very

Influential Person[s] (VIP)" in recruiting efforts "expand[s] the RRNCO's contacts, and permit[s] access to a broader segment of the population."  (Id. at 13 (quoting Exh. 5 at 39, § 5-3b).)

Plaintiff alleges that these policies and regulations impose mandatory duties upon the command structure of the HIARNG to "plan, monitor, and adjust its recruiting efforts in a systematic way."  (Id. at 15.)  He contends that "the systematic degree of planning, monitoring, and adjusting simply did not exist with the program as implemented by the RRSGM ["Recruiting and Retention Sergeant Major"] Douglas Kurt Jackson who supervised  . . . Sgt. Mike Ramirez . . . [who] was Defendant Lum's immediate supervisor."  (Id. (explanatory brackets added).)  Plaintiff concludes that the "lack of systematic planning, monitoring, and adjusting resulted in exposing K'Hiry, a vulnerable female recruit lead, to a very junior RRNCO, Defendant LUM, whose intentional and/or negligent acts of misconduct ultimately caused K'Hiry serious emotional distress."  (Id.)

At the outset, this Court notes that various courts have held that decisions relating to the supervision of employees are discretionary.  See Holy See, 557 F.3d at 1084 (noting that the Ninth Circuit has "held the . . . supervision . . . of employees to be discretionary acts"); Nurse v. United States, 226 F.3d 996, 1001 (9th Cir. 2000) (noting that claims for negligent supervision and training "fall

squarely within the discretionary function exception"); Burkhart, 112 F.3d at 1217 (holding that decisions concerning the supervision of employees are discretionary in nature and therefore, immune from judicial review); Attallah v. United States, 955 F.2d 776, 784 (1st Cir. 1992) (noting that "how, and to what extent the [United States] Customs Service supervises its employees certainly involves a degree of discretion").  As to the second prong, courts have also held that the manner in which the United States supervises its employees involves the types of judgment that the discretionary function exception was designed to shield.  See Holy See, 557 F.3d at 1084 (holding that the decision of how to supervise an employee is the type of judgment that the discretionary function exception was designed to protect); Vickers, 228 F.3d at 950 (noting that courts "have held that decisions relating to the . . . supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield"); Burkhart, 112 F.3d at 1217 (holding that "supervision choices . . . are choices susceptible to policy judgment") (quotation marks omitted); Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995) (noting that "[i]ssues of employee supervision . . . generally involve the permissible exercise of policy judgment and fall within the discretionary function exception."); Attallah, 955 F.2d at 784 (noting that "how, and to what extent the [United States] Customs Service

supervises its employees certainly involves . . . policy considerations of the kind that Congress sought to protect through the discretionary function exception").

Similarly, courts have held that decisions relating to the hiring, training, and retention of employees are discretionary.  See Holy See, 557 F.3d at 1084 (noting that the Ninth Circuit has held the hiring, training, and retention of employees to be discretionary acts); Nurse, 226 F.3d at 1001 (noting that claims for negligent training "fall squarely within the discretionary function exception"); Burkhart, 112 F.3d at 1217 (holding that decisions concerning the hiring and training of employees are discretionary in nature and therefore, immune from judicial review).  In addition, such decisions have been held to be, at the very least, susceptible to a policy analysis.  See Vickers, 228 F.3d at 950 (noting that courts "have held that decisions relating to the . . . training . . . of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield").

In the present case, Plaintiff fails to provide the Court with any mandatory governmental policy or regulation that was allegedly violated by the Government in its supervision or training of Mr. Lum.  The Court notes that, other than case law broadly discussing general negligence, Plaintiff provides absolutely no legal authority for holding that the Government's allegedly negligent

supervision or training can overcome the discretionary function exception.

### 1.     Discretionary Conduct

Turning to the two-part test, the Court considers whether the challenged conduct is discretionary.  The Government cites to Ninth Circuit law holding that training and supervision is a discretionary function.  In response, Plaintiff's citations to various provisions within the Recruiting Operations manual (Exhibit 4), the Personnel Procurement pamphlet (Exhibit 5), and the Personnel Procurement regulation (Exhibit 6) do not identify any mandatory law, policy, or regulation, other than to state general job duties.[7]  The Court holds that, if anything, Plaintiff's exhibits support the Government's arguments that recruiters and their supervisors must exercise discretion in the performance of their duties. Section 4-10 of Exhibit 4 only advises recruiters and their superiors that "prospecting must be planned and purposeful" to avoid "wander[ing] the

---

[7] In his Complaint, Plaintiff cites to National Guard Regulations 600-21 and 385-10, Army Regulation 600-20, and Department of Defense Directive 6495.1 that supposedly required the Government to train and supervise Mr. Lum.  (Compl. ¶¶ 28-29.)  The Government argues in its Motion that these regulations do not create any mandatory training and supervision duty.  (Mot. at 8-9.)  However, Plaintiff relies on other manuals and regulations in his memorandum in opposition, rather than the regulations cited in his Complaint.  Because Plaintiff does not address these regulations in his memorandum in opposition, the Court assumes that Plaintiff is not relying on these regulations to support his position against the discretionary function exception, and thus the Court does not consider them here.

neighborhoods looking for potential recruits or sitting at their desks day after day dialing numbers out of the local phone book." (Mem. in Opp'n, Exh. 4 at 4-3, § 4-10.) This section does not specify a mandatory policy or procedure, but merely offers general advice. Next, section 4-13 advises commanders to create a recruiting operation plan to best utilize their resources and direct them in the most efficient way possible. Commanders are advised that they "have tools that help determine where, when, and how to prospect most effectively. At station level **commanders must consider their strengths, weakness, opportunities, and threats (SWOT) recruiting function analysis and prospecting analysis** to prepare their recruiting operation plan." (<u>Id.</u> at 4-4, § 4-13 (emphasis added).) This section clearly demonstrates that commanders have discretion to create an effective recruiting plan, based on their consideration of the various factors in their particular situations. It is up the commanders to "determine where, when, and how" to develop recruiting plans. (<u>Id.</u>) Moreover, the recruiting plan must be "continuously monitored and adjusted if necessary to redirect operations or exploit timely opportunities." (<u>Id.</u> at 4-8, § 4-40.) These adjustments would necessarily involve the judgment and discretion of the commanders and their subordinates. In other words, the Government employees' use of discretion to create and maintain the most effective recruitment plan invokes the discretionary function exception

and shields their actions from judicial scrutiny.

Plaintiff additionally points to the Personnel Procurement regulation, arguing that it contains recruiting policies and practices that impose certain mandatory duties on the HIARNG.  For example, commanders are directed to develop plans to achieve established end strength goals, and others are charged with establishing performance standards, monitoring and evaluating subordinates, and other recruitment activities.  (Mem. in Opp'n at 14-15 (citing Exh. 6 at 9, § 2-17).)  However, Plaintiff again fails to point out any mandatory regulation or policy in the Personnel Procurement regulation relating to Mr. Lum's training or supervision that the Government may have violated.  The sections discussed by Plaintiff merely stand for the proposition that commanders are to develop a plan and help recruiters in their recruiting efforts.

Even when given an opportunity to clarify the importance of Exhibit 6, the most that Plaintiff could do was state that the Personnel Procurement regulation provides "general information about the command structure, roles, duties, and responsibilities that exist within the Hawaii Army National Guard." (Pl.'s Supplemental Br. at 3.)  Plaintiff does not direct the Court to any specific regulation or policy within the Personnel Procurement regulation that the Government allegedly violated, other than to observe that the officers at various

24

levels "have specific duties and responsibilities to systematically plan, develop, implement, monitor, and adjust the overall recruiting efforts . . . ." (Id.) The fact that personnel at various levels have certain job responsibilities does not evidence any mandatory policy or regulation.

At the hearing on this Motion, Plaintiff argued that the operative governmental policies or regulations that defeat the discretionary function exception concern the command structure's recruiting plan and the execution of that plan. In particular, he argued that the policy of "prospecting" with COIs and VIPs establishes the existence of a Government policy to target groups such as the MMA community, which led Mr. Lum to pursue K'Hiry as a possible recruit in an effort to make connections through Plaintiff. However, Plaintiff still fails to identify any specific policy employed by the Government as to "prospecting" recruits. Exhibit 5 to his memorandum in opposition, which discusses COIs and VIPs, only identifies the benefits that a COI or VIP may provide, but does not mandate any particular action with regard to prospecting COIs or VIPs.[8] (Mem. in

_____

[8] The relevant section on COIs and VIP merely provides:

> Recruiting and retention success may be difficult to achieve without the help of these individuals. COI's and VIP's are available to RRNCOs because of their contacts. The COI/VIP expands the RRNCO's contacts, and

Opp'n, Exh. 5 at 38-39, § 5-3.)  Rather, the Personnel Procurement pamphlet offers

guidance as to effective recruiting and suggests that certain types of individuals

may be useful contacts.  (Mem. in Opp'n, Exh. 5 at 37, § 5-1.)  Indeed, Mr. Lum

only states in his declaration that "the Marketing NCO ["Non-Commissioned

Officer"] at the Guard had told me about this [that the HIARNG advertised in a

local MMA magazine] and suggested that the MMA community would be a good

group from which to recruit."  (Lum Decl. at 4 (explanatory brackets added).)  Mr.

Lum does not identify any statute, regulation, or policy that he was bound to

follow, but states that he based his actions off of a tip from a fellow HIARNG

member.  Thus, the material cited by Plaintiff does not mandate any specific policy

or regulation that the Government allegedly violated.

 As stated by the United States Supreme Court, the discretionary

---

 permits access to a broader segment of the population.
 RRNCOs, who ask for and use their COI/VIPs', [sic]
 help enhance their chances of success and are often more
 efficient.  A COI might be the owner of a local business
 who employs ARNG members in the unit nearby.
 He/she supports the ARNG and its members and will
 refer individuals to the RRNCO from time to time.
 Another example of a COI is the veterans representative
 at the State employment office.  The individual talks with
 recently separated service members who are seeking
 employment.

(Mem. in Opp'n, Exh. 5 at 39, § 5-3b.)

element is not met where "a federal statute, regulation, or policy specifically

prescribes a course of action for an employee to follow." Berkovitz, 486 U.S. at

536 (internal quotation marks and citation omitted). In such event, our inquiry is at

an end, and the discretionary function exception does not apply because "the

employee has no rightful option but to adhere to the directive." Id. However, in

the present case, Plaintiff does not offer any statute, regulation, or policy that

prescribes a mandatory course of action with regard to Mr. Lum's training and

supervision. Rather, it appears from the regulations and policies cited by Plaintiff

that the Government employees are given the tools and information to use their

discretion in creating recruitment plans that are best tailored to their particular

areas and situations. The fact that the creation and maintenance of such plans are

mandated does not evidence any policy or regulation that the Government violated

with respect to the implementation of those plans.[9] Thus, the Court holds that the

---

[9] Although not germane to the discretionary function analysis, the
Government has provided evidence that Mr. Lum was properly trained and
supervised, while Plaintiff fails to provide any evidence that the Government
breached any of the policies it highlights from the Recruiting Operations manual,
Personnel Procurement manual, or Personnel Procurement regulation. Without
citing to any evidence, Plaintiff baldly proclaims that "the systematic degree of
planning, monitoring, and adjusting simply did not exist with the program as
implemented by RRSGM Douglas Kurt Jackson who supervised . . . Sgt. Mike
Ramirez . . . [who] was Defendant LUM's immediate supervisor." (Mem. in

Government has upheld its burden in demonstrating that the acts complained of by Plaintiff are all discretionary in nature and require an element of judgment or choice, and that Plaintiff has failed to identify any mandatory statute, regulation, or policy that falls outside of the discretionary function exception.[10]

### 2. Susceptible to Policy Analysis

Because this Court has determined that the Government's conduct is discretionary, it must next determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536. Although not discussed at any length by either party, it appears that the training and supervision of Mr. Lum are susceptible to policy analysis. See Holy See, 557 F.3d at 1084-85 (retention and method of supervision of employee were type of judgments that discretionary function exception was meant to protect); Burkhart, 112 F.3d at 1217 (training of employees requires consideration of financial constraints, public safety, complexity of tasks involved, which are

---

Opp'n at 15.) Based on the record before it, the Court cannot say that the Government failed to train and/or supervise Mr. Lum properly.

[10] The Court also agrees with the Government's position that Plaintiff's recent attempts to characterize his claims against the Government as "general" negligence claims necessarily fails. Even if the Court were to accept this belated claim of "general" negligence, Plaintiff has still not pointed to any mandatory statute, policy, or regulation that the Government allegedly violated.

decisions "among those involving the exercise of political, social, or economic judgment"). The Government also argues that the regulations are actually based on a number of governmental policy considerations, including available funding and recruitment needs. As such, the Court finds that the Government's actions at issue here are susceptible to policy analysis and involve the type of judgments protected by the discretionary function exception. Therefore, the discretionary function exception precludes suit against the Government for its actions relating to Mr. Lum's training and supervision, and the Court thus DISMISSES the First and Third Causes of Action against the Government.

## C.     <u>Second Cause of Action</u>

As to the Second Cause of Action, Plaintiff alleges that the Government "is further liable for Defendant Lum's negligent infliction of emotional distress under a theory of respondeat superior because most of his conduct was the kind he is employed to perform as a recruiter, his conduct occurred substantially within the authorized time and space limits, and was at least partially actuated by a purpose to serve Defendant United States of America." (Compl. ¶ 34.)

In its Motion, the Government takes the position that Mr. Lum was not acting within the scope of his employment when he allegedly assaulted K'Hiry.

The Government argues that the waiver of sovereign immunity "extends only to the actions of its employees when they are 'acting within the scope of [their] office or employment.'" (Mot. at 12 (quoting 28 U.S.C. §§ 1346(b)(1) & 2679(b)).) Citing to Kang v. Charles Pankow Associates, 5 Haw. App. 1, 7-8, 675 P.2d 803, 807-08 (1984), the Government argues that, under Hawaii law, "the employer can only be held liable under the doctrine of respondeat superior for the negligent acts of his employees when 1) the actions are the type of duties that the employee is expected to perform, 2) it occurs substantially within the authorized time and space limitations and 3) there is some direct benefit to the interests of the employer." (Mot. at 13 (citing Kang, 5 Haw. App. at 7-8).) The Government contends that sexual assault falls outside of the duties that military recruiters are expected to perform and confers no benefit on the HIARNG, and the alleged assault took place at Mr. Lum's residence, which is an unauthorized location outside of the time and space of Mr. Lum's employment. (Id. at 13-14.) As such, because Mr. Lum was not "acting within the scope of [his] office or employment" the Court lacks subject matter jurisdiction over the Second Cause of Action.

In response, Plaintiff points to the use of the HIARNG's targeting of COIs and VIPs in its recruiting efforts. (Mem. in Opp'n at 13 (citing Exh. 5 at 38-39, § 5-3).) Plaintiff claims that, despite Mr. Lum's denial of improprieties toward

K'Hiry, "it is clear from the declaration of Defendant LUM that he was acting within the scope of his employment as he testified that he was cultivating K'Hiry as a lead to make contact with Plaintiff as either a COI or VIP to meet the overall recruiting goals . . . ."  (Id.)

Despite Plaintiff's attempts to characterize Mr. Lum's actions as comporting with his recruitment duties, the Court agrees with the Government's analysis.  As the Court previously ruled in its Order denying Mr. Lum's Motion to Compel Representation, Mr. Lum was not acting within the scope of his employment when the subject incidents allegedly occurred at his residence.  For that previous motion, the Court looked to Hawaii law regarding respondeat superior, which relies on the Restatement (Second) of Agency § 228.  See Villeza v. United States, CV. NO. 05-00043 JMS-BMK, 2006 WL 278618, at *3 (D. Haw. Jan. 5, 2006) (citing Henderson v. Prof'l Coatings Corp., 819 P.2d 84, 88 (Haw. 1991)).  Section 228 provides:

> Conduct of the servant is within the scope of employment
> if, but only if:
>   (a) it is of the kind he is employed to perform;
>   (b) it occurs substantially within the authorized
>        time and space limits; [and]
>   (c) it is actuated, at least in part, by a purpose to
>        serve the master[.]

Restatement (Second) of Agency § 228; see Villeza, 2006 WL 278615, at *3.

The Court determined that, based on the facts before it (i.e., Mr. Lum's Declaration), although Mr. Lum had the goal of recruiting K'Hiry or making contacts with her father, Mr. Lum was not acting within the scope of his employment when K'Hiry visited his residence during the two subject incidents. This Court stated:

> Lum fails to meet his burden of establishing by a preponderance of the evidence that his conduct during the two occasions K'hiry was at his home fell within the scope of his employment as a National Guard recruiter. Although Lum presents his Declaration which claims he intended to recruit her and her father's friends, no discussions regarding recruiting occurred at these meetings. Instead, Lum was playing video games while she was dancing, singing, and making sexual comments. ***This conduct was not the type he was employed to perform as a recruiter for the National Guard***. Further, ***the two meetings were not within authorized time and space limits for his employment***; rather they were at his home, after work, during the afternoon and evening. Lastly, ***the evidence does not establish that his conduct was actuated by a purpose to serve the National Guard because no discussions regarding recruitment occurred at his home.*** The Court therefore finds that Lum fails to meet his burden of establishing by a preponderance of the evidence that his actions were within the scope of his employment.

(Order Denying Without Prejudice Mot. to Compel Representation at 7 (emphases added).)

The factual record before the Court has not changed in the ten months

since the Court heard the Motion to Compel Representation.  Mr. Lum has offered his version of events in his Declaration, and Plaintiff only offers the inadmissible hearsay statements contained in his own answers to interrogatories.  (See Mem. in Opp'n, Exh. 2.)  At the hearing on this matter, Plaintiff only restated the uncontroverted fact that Mr. Lum had hoped to recruit K'Hiry or make contacts within the MMA community to increase his recruiting statistics and concluded that Mr. Lum was following some directive within the scope of his employment to recruit within the MMA community.  Plaintiff does not provide the Court with any additional information that would change the Court's analysis regarding the scope of Mr. Lum's employment.  As such, because Count II is based entirely on a respondeat superior theory and the Court adheres to its previous holding that Mr. Lum was not acting within the scope of his employment at the time that he allegedly sexually assaulted K'Hiry, the Court DISMISSES the Second Cause of Action as to the Government.

Accordingly, the Court GRANTS the Motion to Dismiss and dismisses all claims against the Government.  The acts complained of by Plaintiff fall within the discretionary function exception, and Plaintiff has not identified any mandatory policy or regulation.  Furthermore, the Court holds that Mr. Lum was not acting within the scope of his employment at the time of the subject incidents.

II.　SUPPLEMENTAL JURISDICTION

Based on the Court's holdings herein, the Court dismisses the Government as a defendant in this case. This case was originally filed in this Court on the basis of federal question, as Plaintiff had sued the Government, in addition to Mr. Lum, asserting FTCA and state-law claims. Now that the Government is no longer a party to this case, all that remains are state-law claims against Mr. Lum, a non-diverse party. The Court thus considers whether to exercise its supplemental jurisdiction to retain the case, or dismiss it for lack of subject matter jurisdiction.

The federal supplemental jurisdiction statute provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> **(3) the district court has dismissed all claims over which it has original jurisdiction, or in exceptional circumstances, there are other compelling reasons for declining jurisdiction**, or
>
> (4) in exceptional circumstance, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added).

The Ninth Circuit has recognized that courts may consider *sua sponte* whether to continue exercising supplemental jurisdiction over solely state claims. See Acri v. Varian Assocs., Inc., 114 F.3d 999, 1001 n.3 (9th Cir. 1997) (suggesting that a district court may, but need not, decide *sua sponte* whether to continue exercising supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) once all federal law claims have been dismissed). In deciding whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c), "a district court must undertake a case-specific analysis to determine whether declining supplemental jurisdiction comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." Bahrampour v. Lampert, 356 F.3d 969, 978 (9th Cir. 2004) (internal quotations and alterations omitted).

In the present case, the Court will exercise supplemental jurisdiction

over Plaintiff's remaining claims.  In considering judicial economy and convenience, the Court notes that this case has been pending for over three years, with trial only a few months away.  It would make little sense to dismiss this case, only to have the parties relitigate this entire matter from the beginning in state court.  To do so would undoubtedly cause the parties to expend great time and expense just to reach this current stage of litigation.  Furthermore, the remaining issues presented herein—claims for battery and intentional and negligent infliction of emotion distress arising from an alleged sexual assault—are not particularly complex or unique such that the state court would be a more appropriate venue. The Court is familiar with the facts and law presented in this case, and it is more than capable of competently overseeing the disposition of the remaining claims. Accordingly, the Court determines that, in considering the values of economy, convenience, fairness, and comity espoused by the Ninth Circuit, it will exercise supplemental jurisdiction over the remaining claims.

## CONCLUSION

Accordingly, the Court GRANTS the Government's Motion to Dismiss, because the discretionary function exception divests the Court of subject matter jurisdiction over Plaintiff's claims against the Government, and Mr. Lum was not acting within the scope of his employment when he allegedly assaulted

K'Hiry.  Additionally, the Court elects to exercise supplemental jurisdiction over

Plaintiff's remaining claims against Mr. Lum.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, <u>March 16, 2015</u>.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

<u>Thompson v. United States of America, et al.</u>, CIV. NO. 11-00791 BMK; ORDER GRANTING
DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS COMPLAINT